**CITIES SERVICE REFINING CORPO-RATION, Libellant,**

v.

**NATIONAL BULK CARRIERS, Inc., et al., Respondents.**

No. 1262.

United States District Court
S. D. Texas, Houston Division.

Aug. 6, 1956.

Eastham, Hinds & Dale (Alan S. Dale and Dan H. Hinds), Houston, Tex., for libellant.

Fulbright, Crooker, Freeman, Bates & Jaworski (Carl G. Stearns and E. V.

Greenwood), Houston, Tex., for respondent, National Bulk Carriers, Inc.

Lockhart, Watson & Peterson (Edward Watson), Galveston, Tex., for respondent, Gulf States Marine & Mining Co.

Royston & Rayzor (M. L. Cook), Houston, Tex., for respondents G. & H. Towing Company, Bay-Houston Towing Company, and Suderman & Young Towing Company, Inc.

Robert Eikel, Houston, Tex., for respondent, R. I. Sample.

HANNAY, Chief Judge.

This is an action to determine liability in connection with the sinking of the tank barge "Sample No. 1."

At all times mentioned herein, Libellant, Cities Service Refining Corporation, was and still is a corporation organized and existing under and by virtue of law, and was the owner of 15,348.67 net barrels of sour crude oil on board the tank barge "Sample No. 1" at the time of the casualty hereinafter set out.

The SS "Phoenix" is an American tank ship of 14,179 gross tons and 11,539 net tons, length 542.6 feet, breadth 80.2 feet, and depth 40.1 feet.

Respondent, National Bulk Carriers, Inc., was and still is a corporation organized and existing under and by virtue of law, with an office in Galveston, Texas, and was and is the owner and operator of the SS "Phoenix".

The tug "C. R. Haden", is a steel diesel tug 81.1 feet long and 24 feet wide, while the tug "Propeller" is a steel diesel tug 81.7 feet long and 25 feet in breadth.

Respondent, Bay-Houston Towing Company, was and still is a corporation organized and existing under and by virtue of law, with an office in Houston, Texas, and was and still is the owner of the tug "C. R. Haden."

Respondent, Suderman & Young Towing Company, Inc., was and still is a corporation organized and existing under and by virtue of law, with an office in Houston, Texas, and was and still is the owner of the tug "Propeller."

Respondent, G. & H. Towing Company, was and still is the Charter Operator of the tugs "C. R. Haden" and "Propeller."

The Barge "Sample No. 1" is a steel tank barge fitted for carrying bulk oil and having a capacity of 19,666 short tons, length 244 feet, breadth 50 feet, and draft of 8 feet, (loaded), and was owned by R. I. Sample.

Respondent, Gulf States Marine & Mining Company, was and still is a corporation organized and existing under and by virtue of law, and was and still is the owner of the tug "Dispatch" and bareboat charterer and operator of Barge "Sample No. 1", having entered into a written contract of affreightment (entitled on its face "barge charter party") with Cities Service Refining Corporation, Libellant herein, for the transportation of a stated quantity of crude oil from Houston, Texas, to Lake Charles, Louisiana.

The Texas Company slip is 685 feet long and 255 feet in width.

Pursuant to said contract of affreightment, early on the evening of December 31, 1952, said barge "Sample No. 1", (hereinafter referred to as Barge) was placed by the Tug "Dispatch" along the west side of the Texas Company slip; and while such barge was loading her cargo, or nearing the completion of the loading, the SS "Phoenix", assisted by the tugs "Propeller" and "C. R. Haden", entered the slip and proceeded to dock on the east side thereof. The method of entering was by having both tugs push the SS "Phoenix" in sidewise, and in so doing the movement of the SS "Phoenix" as well as the movement of the said tugs, caused turbulent water and wheelwash to be thrown onto and over the barge. The barge at that time was deeply loaded, with probably only 4 to 6 inches of freeboard. The manhole of the barge, some 16 x 20 inches in size, was open on the barge's freeboard side and water

entered the buoyancy tank through such open manhole.

A short time before the entrance of the SS "Phoenix" and the accompanying tugs, the tug "C. R. Haden" entered the Texas Company slip and came near the barge, at which time Captain Adams, the Master in charge on this and a later trip, observed that the barge was loading, unattended, had a very low freeboard aft, and that no lights were burning on said barge. Each of such acts constituted negligent conduct.

About 15 minutes later that evening, in bringing in and moving the SS "Phoenix" in the slip, neither of the tugs had a lookout to ascertain the effect that their respective washwaters were having upon the barge, although Captain Adams had observed water going over and upon the barge. A large quantity of water did enter through the open manhole of the barge, which caused the stern of the barge to sink beneath the surface of the water and the front end of the barge was lifted out of the water. The barge was partially sunk, resulting in loss of cargo belonging to Libellant.

The main question to be determined herein is who was at fault in the sinking of the barge.

In addition to the above facts, I find that the tug "Dispatch" had the barge in its sole custody and control; that the barge was overloaded in the stern, with only a small freeboard showing; that it was negligence to permit the manhole to remain open on a low-lying barge under the circumstances and at such time and place.

I further find that it was negligence on the part of the tug "Dispatch" and its crew to fail to close the manhole when the water first began to go over the stern of such barge. At that time, the Chief Engineer of the tug "Dispatch", had gone to the "Dispatch", which was nearby in the Ship Channel, although he was the only licensed tankerman authorized to do the loading of the barge.

I further find that Hubbard, the Master of the "Dispatch," had left the vicinity, and that he did not return until the barge was nearly sunk.

I further find that the Mate of the "Dispatch", Whitworth, while on or near the dock, made no effort to place a cover on the open manhole, and that even if he had made such an effort, he had no proper wrench or other tool with which to accomplish that feat.

I further find that no other employee of the "Dispatch" was in charge of or kept a lookout over the barge that night.

I find that such named employees of the tug "Dispatch" were inattentive and incompetent in their duties on such New Year's Eve, and were so found to be by their employer who separated them from its services soon after January 1, 1953.

I further find that there were no loading lights on the barge in question on that dark winter night.

Libellant attempted to show that the barge was unseaworthy at the time of its sinking because it had sustained a fracture of the after-buoyancy space in the corner of the knuckle plate. This, however, had been repaired, and it was not causing leakage to such an extent as to be of any consequence at the time of the barge's sinking.

The SS "Phoenix" strongly claims that the barge was over-loaded in her stern cargo compartment; that she was negligent in failing to close the manhole; in not having a wrench available; in failing to keep a proper lookout; in not warning the "Phoenix" of the open manhole; in not having proper lights on board when such barge was located in a place where the visibility was poor.

I am of the opinion that when the tug "C. R. Haden's Captain Adams saw the large amount of wheelwash and turbulence from his direction, as well as from the SS "Phoenix" and the tug "Propeller", going over the stern of the barge he should have attempted to do something in aid of the situation, which he did not do. Further, both the SS "Phoenix" and the two tugs had search-

lights aboard on the night in question and they made no attempt to turn them on the barge, either to observe the position or the condition of the barge, while they were entering the Texas Company slip.

### Conclusions of Law.

From the above and foregoing findings, I conclude as a matter of law that, at the time and on the occasion in question, the crew of the tug "Dispatch" was negligent and gravely at fault, and such faults were plain, substantial, contributing and statutory major faults.

Furthermore, I conclude that, considering the sidewise manner of entering the Texas Company slip, the size of the slip, the size of the SS "Phoenix", the size of the two tugs and the barge, and the speed with which the "Phoenix" was brought into the slip by the two tugs, together with the failure of the tugs, each and both, to keep a proper lookout (and especially the tug "C. R. Haden" after her Captain had discovered the low freeboard of the barge and the absence of any attendant on such barge), and the non-use of the searchlights on the tugs on such a dark night, the Charterer of such tugs, G. & H. Towing Company was guilty of plain, substantial, contributing statutory major faults.

I, therefore, hold that, primarily, the damages resulting from the sinking of the barge "Sample No. 1" should be shared in the following proportions: One-half by Gulf States Marine & Mining Company and one-half by G. & H. Towing Company. Secondarily, I hold that should the one-half adjudged against Gulf States Marine & Mining Company not be paid, that the barge "Sample No. 1" should respond for such one-half. I, likewise, hold that should the Charterer of the two tugs (the "C. R. Haden" and the "Propeller") not respond for one-half of the damages herein assessed, then that the owner of the SS "Phoenix" is secondarily liable for the damages so adjudged against said towing company.

I likewise hold that all costs in this case be adjudged against said above named parties in the same proportions and in the same manner as the assessment of damages herein.

Clerk will notify counsel.